**BYNUM et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 9453.

Circuit Court of Appeals, Fifth Circuit.

July 2, 1940.

Ross M. Lambdin and Walter G. Russell, both of Amarillo, Tex., for petitioners.

John A. Gage and Sewall Key, Sp. Assts. to Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, and C. E. Lowery, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

FOSTER, Circuit Judge.

Petitioners in this case are stockholders in the Badger Oil Co. and, in making individual returns for income taxes for the year 1935, deducted the cost of their stock from two dividends received from that company during the taxable year, contending they were liquidating dividends. The commissioner held that the dividends were ordinary dividends paid from earned surplus and determined deficiencies. The Board affirmed the Commissioner's ruling. 40 B. T. A. 336.

The case was submitted on a stipulation of facts, certain documents and the testimony of two witnesses. The facts are undisputed. Those material to the issue presented are as follows:

Badger Oil Company, hereafter referred to as the company, was incorporated in 1926 under the laws of Texas, for the purpose of purchasing, leasing, developing and operating oil and gas properties, with a capital stock of 112,500 shares of $1 par value. The stock was all sold. In part payment for stock the company acquired oil and gas leases on some 1,400 acres of land in Hutcheson and Carson Counties, Texas, in what was known as the Lewis Ranch and later purchased an additional lease covering 126 acres of the same tract. This lease had a producing well. Up to January first the corporation drilled six additional producing wells. In 1934 the corporation purchased the fee simple title to the entire Lewis Ranch, about 2,900 acres.

By acquiring fee simple title the company acquired the ⅛ royalty interest retained by the owners but the owners had made other leases on the land, which were not affected by the sale, so the company, in fact, acquired from ⅖ to ⅘ of the retained royalty interest. On February 20, 1935, the company transferred all its leases, covering about 1,400 acres, including all the equipment, including motor vehicles, located on the land covered by the leases, to International Petroleum Corporation, for $365,000; $200,000 in cash and the balance, $165,000 represented by notes, payable $5,000 a month with interest. A balance sheet, prepared by the commissioner's expert and adjusted to cost, tends to show the assets transferred had the value of about $189,650. When the cash was received the company adopted a resolution to liquidate its affairs and to pay a dividend of $1.50 a share as a liquidating dividend to the stockholders, requiring the stock certificates to be presented and have the liquidating dividend stamped thereon. At that time there were outstanding 102,500 shares owned by 75 different stockholders. No other dividends had ever been paid and the total accumulated surplus was $23,332.40. After transferring leases the company had only the fee simple title to the Lewis Ranch, which carried with it the retained royalties on oil produced. The liquidating resolution authorized and instructed the board of directors to pay all obligations due and to accrue and to take such action as might be necessary to sell the remaining assets of the company at such time and in such manner as in their best judgment could be deemed to be for the best interest of the stockholder without sacrificing the company's assets. A fund of about $70,000 was retained to pay obligations due and income taxes on the profit from the sale. The resolution also directed that, after all the property was disposed of, the charter should be surrendered. The purchase money notes were all paid in August, 1935, and another liquidating dividend, of $1 per share was declared and paid. The company continued to hold title of the Lewis Ranch, rented part of it for grazing, built two windmills to supply water for the cattle, granted some rights of way over the land and sold some gravel off the land. As to this, B. C. D. Bynum, president of the company testified, in substance, that some grazing leases had been made to get money to pay the taxes; that the windmills were necessary to supply water for the cattle; that trespassers had occupied rights of way over the land and he had them checked up by an engineer and effected settlements; and that they sold a little gravel because it was being stolen.

Some 68 producing wells have been drilled on the approximately 1,400 acres covered by leases. The balance of the land is considered non productive for oil. It was stipulated that the net income of the company was $22,250.96 for 1936, $23,278.08 for 1937, and $16,147.23 for 1938. Before the resolution to dissolve, Kirk, a stockholder of the company, had purchased an oil lease for it, paying $800 and giving in payment a check of the company signed by himself. This purchase was disavowed on the ground it was not authorized and Kirk refunded the money. Later this lease was taken over by the company and Kirk was reimbursed. As to this Bynum testified the directors concluded they were too technical and unfair in at first disavowing it. The directors received two tentative offers to purchase the remaining holdings for about $200,000. These offers were not final and binding if accepted. The liquidators indicated they would not consider an offer of less than $300,000.

■ While the facts are undisputed, the case presents a mixed question of fact and law. We are not bound by the decision of the board and may draw our own conclusions from the facts. Bogardus v. Com'r, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32.

■ The case comes under the provisions of the Revenue Act of 1934. Section 115

(i), 26 U.S.C.A. Int.Rev.Code § 115(i), is as follows: "Definition of partial liquidation. As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

Treasury Regulations 86, Art. 115—5 merely repeat the law. It is plain the act contemplates the liquidation of a corporation in an orderly manner by disposing of part of its assets and distributing those proceeds at the time and liquidating other assets at a later date. It would be useless to review the authorities cited by both sides on that point as each case depends upon its own facts.

The Commissioner reached the conclusion there was no intention on the part of Badger Oil Co. to liquidate and terminate its affairs and dissolve; and that the dividends were paid out of profits and therefore ordinary dividends, from which the cost of the stock could not be deducted in making income tax returns. The Board rested its affirmance on the ground that the company sold a portion of its assets at a large profit but retained assets which had a value in excess of the par value of its shares; that none of its shares of stocks were canceled or redeemed nor was the par value of its shares reduced.

■ We do not agree with the conclusions of either the commissioner or the board. Many corporations have stock of no par value. One dollar a share was a nominal value only. The stockholders of a corporation have an equitable interest in the net assets of the corporation, after liabilities are liquidated, which is not necessarily measured by the par value of the stock. Each stockholder is entitled to receive his pro rata of the net assets in liquidation, according to the number of shares of the stock he holds, whether it is less or exceeds the par value. The indorsement of the liquidating dividends on the stock certificates canceled and redeemed them to that extent. If the balance sheet prepared by the commissioner be given full effect there was a profit on the sale of the leases of approximately $176,000. $70,000 was retained by the corporation to pay debts due and to accrue, leaving a net sum for distribution of about $106,000. There

were 102,500 shares of stock outstanding. The balance of profit was not enough to pay the first dividend of $1.50. But that is beside the issue. The equitable ownership in the assets was for all they were worth, whether their sale resulted in a profit over cost or not. It is apparent that both dividends were paid out of the capital assets of the company.

The principal contention of the commissioner, approved by the board, is that because the company retained the fee simple title to the Lewis Ranch, and would not sell it for $200,000, when that price was offered, the company must be held to be still doing business and not in liquidation. It is not the province of the commissioner to substitute his judgment for that of the liquidators. They were vested with discretion by the liquidating resolution to dispose of the retained assets for the best interest of the stockholders. We do not consider it a breach of discretion for the liquidators to hold out for a price of $300,000. The drilling of some 60 additional producing wells by International Petroleum Corporation greatly increased the value of the fee simple estate by increasing the amount of retained royalties. Over a three years period the net income for the property not disposed of averaged over $20,000. On the basis of $300,000 that would be better than six per cent income per annum. The stockholders should not be penalized because the liquidators held out for a better price than $200,000.

We conclude the company went into liquidation in good faith. It had earned nothing to be distributed in dividends to stockholders over the nine years it had been doing business, and had a surplus of only $23,000 at the end of that period available to further develop the tract. Good reason to liquidate is apparent. Such acts of ownership as are shown were reasonable and necessary to conserve the property. Taking over the lease from Kirk was equitable and we think good reason for doing so was shown. It can not be said the company was continuing to do business under its charter. On the whole case we consider both the commissioner and board were wrong in their conclusions drawn from the undisputed facts.

The petition is allowed, the judgment of the board is reversed and the case is remanded.