OSCAR E. BAAN AND EVELYN K. BAAN, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

IRVING GORDON AND MARGARET GORDON, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 949–63, 3949–63. Filed March 26, 1969.

*Harry R. Horrow* and *Stephen J. Martin*, for the petitioners.
*Richard K. Seltzer*, for the respondent.

OPINION

RAUM, *Judge:* These cases are before us on remands from the Second and Ninth Circuits, following the decision of the Supreme Court herein. *Commissioner* v. *Gordon*, 391 U.S. 83. We made complete findings of fact when the cases were in this Court the first time (45 T.C. 71), and the facts have been summarized not only by the two Courts of Appeals, 382 F. 2d 485 (C.A. 9); 382 F. 2d 499 (C.A. 2), but also by the Supreme Court itself. We refer to our previous findings for a full account of the events involved and will now set forth only an abbreviated version thereof.

Prior to July 1, 1961, Pacific Telephone & Telegraph Co. (Pacific) conducted its telephone and other communications business in California, Oregon, Washington, and Idaho. During all of 1961 the outstanding capital stock of Pacific consisted of 104,756,943 shares of common stock and 820,000 shares of cumulative preferred stock. At all times during 1961, American Telephone & Telegraph Co. (A.T. & T.) owned 90.25 percent of Pacific's outstanding common stock and 78.17 percent of Pacific's outstanding preferred stock, or an aggregate of 89.62 percent of the total voting power of Pacific. The minority common and preferred shares were publicly held by over 38,000 shareholders, and have been traded on the New York Stock Exchange and the Pacific Coast Stock Exchange. Petitioners Baan, residents of California, and petitioners Gordon, residents of New York, were among these minority stockholders; the Baans owned 600 shares of Pacific common and the Gordons owned 1,540 shares of Pacific common.

As a result of the vast expansion of Pacific's telephone and other communications business it was decided early in 1961 to divide Pacific's operations into two separate corporations by transferring its Oregon, Washington, and Idaho business (about 20 percent of its total business) to a new corporation created for that purpose, Pacific North-

west Bell Telephone Co. (Northwest). Northwest was organized in March 1961, with an authorized capital stock of 50 million shares of one class common having a par value of $11 per share. Pacific at once purchased 10,000 of those shares for $110,000 in cash. Subsequently, on June 30, 1961, after approval by various governmental regulatory agencies, Pacific transferred to Northwest all the assets pertaining to the Oregon, Washington, and Idaho business. In return Pacific received 30,450,000 Northwest shares, a $200 million demand note payable by Northwest to Pacific, and the assumption by Northwest of outstanding liabilities (with certain exceptions) relating to the operations in the three States. As of July 1, 1961, Northwest commenced operations in the newly carved-out territory.

The foregoing transfers were made pursuant to a "Plan For Reorganization of the Pacific Telephone and Telegraph Company" which was approved by the stockholders of Pacific at their annual meeting on March 24, 1961. The plan contemplated the distribution of the Northwest stock by Pacific to its own stockholders through the medium of issuing stock purchase rights to them. Thus, the sale of the Northwest stock pursuant to such rights would provide Pacific with cash to pay its own existing liabilities as well as to meet additional capital needs of Pacific over a period of years. The raising of such cash for Pacific was an important objective of the plan, in addition to dividing the business between two separate corporations for purposes of efficiency in management. The plan, however, did not require the distribution of all the Northwest stock at once. To the contrary, only some 56 percent of that stock (enough to pass control of Northwest to A.T. & T.) was thus to be distributed immediately, and the plan stated that it was "expected" that the remaining stock would similarly be offered for sale within about 3 years in one or more offerings. The plan also provided that Pacific's board of directors would determine the prices at which the shares would be offered at the time of each offering. By thus spacing the offerings the subsequent distribution or distributions of the shares would be made at such time or times as to be coordinated with Pacific's need for new capital.

In accordance with the plan, Pacific on September 29, 1961, issued to its common stockholders one right for each outstanding share of Pacific.[1] Six rights plus a payment of $16 in cash were required to purchase one share of Northwest. The rights were transferable and expired some 3 weeks later, on October 20, 1961. The rights thus issued were sufficient to support a transfer of some 57.3 percent of the North-

---

[1] Under the plan, A.T. & T. gave up 1,253,301 rights from the total rights (94,542,139) which it would otherwise have been entitled to receive, and the rights thus relinquished by A.T. & T. were given to the minority preferred stockholders on the basis of seven rights for each share of preferred held by them. A.T. & T. received no rights with respect to its preferred shares of Pacific.

west stock. No other offering was made in 1961, and the remaining 43 percent was offered to the Pacific shareholders in a second and final offering on June 12, 1963, under similar conditions except that eight rights plus $16 were required to purchase one share of Northwest.

The Northwest stock was listed on the American Stock Exchange and the Pacific Stock Exchange, and trading with respect to such stock and the 1961 stock rights commenced on September 14, 1961, on a when-issued basis. The average price of the stock on certain days set forth in the record between September 14 and October 20, 1961, ranged from $29.8125 to $26; and the corresponding average price for the rights on those days ranged from $2.234375 to $1.65625.

As a result of the 1961 offering the minority common and preferred shareholders or their assignees acquired 1,897,891 shares of Northwest common by exercising rights, and A.T. & T. similarly acquired 15,548,140 shares. The total fair market value of these shares was $468,852,920, and the cash received by Pacific therefor was $279,136,-496. In the consolidated income tax return of A.T. & T. and its affiliates for 1961 gain in the amount of $8,739,362.07 was reported by Pacific in respect of the Northwest shares sold to the minority stockholders (no gain was reported in respect of the shares sold to A.T. & T. by reason of the consolidated return).

As a result of Pacific's second and final offering it disposed of all of the remaining 43 percent Northwest shares in like manner in 1963, and A.T. & T. emerged with 89.1 percent of the Northwest stock.

Petitioners Baan exercised all of the 600 rights issued to them in 1961; they paid $1,600 cash to Pacific on October 11, 1961, and acquired 100 shares of Northwest. The Gordons similarly exercised 1,536 of the 1,540 rights issued to them in 1961 and acquired 256 shares of Northwest, paying $4,096 to Pacific on October 5, 1961. On the same day they sold the four remaining rights for the net amount of $6.36.

In determining the deficiencies against the Baans the Commissioner ruled that $1,094, the difference between the fair market value of the 100 shares of Northwest acquired by them ($2,694) and the cash paid in connection with such acquisition ($1,600), was taxable as a dividend. He similarly determined that $2,800.64, the difference between the fair market value [2] of the 256 shares of Northwest ($6,-896.64) acquired by the Gordons and the cash paid by them ($4,096), was taxable as a dividend. Also, in his answer in the *Gordon* case, the Commissioner sought to increase taxable income by the amount realized upon the sale of the four remaining rights which the Gordons had received.

---

[2] There is no dispute as to the fair market value determined by the Commissioner with respect to the shares purchased by either the Baans or the Gordons.

As was indicated in our previous opinion (45 T.C. at 87), as well as in the opinions of the Ninth Circuit (382 F. 2d at 489) and the Supreme Court (391 U.S. at 90),[3] the spread between the value of the Northwest stock and the sales price (at $16 a share) constituted taxable dividends,[4] as determined by the Commissioner, unless some provision of the 1954 Code requires different treatment. Petitioners argued that dividend treatment was precluded by any one of three different provisions of the Code: Sections 355 and 354, either of which would render petitioners' gains free of tax altogether, if applicable, and section 346 which would subject those gains to the more favorable capital gains treatment. Petitioners placed their principal reliance upon section 355, dealing with divisive reorganizations. We agreed with petitioners' position in this respect and held that the gains which they realized and which were reflected in the Northwest stock received by them were entitled to nonrecognition under section 355. In our view the transfer of the Oregon-Washington-Idaho business to Northwest was truly a spin-off and was carried out in such manner as to bring into play the nonrecognition provisions of section 355. We therefore found it unnecessary to consider petitioners' alternative contentions under sections 354 or 346. The courts of appeals divided on the applicability of section 355, and in resolving the conflict between the two circuits the Supreme Court held that section 355 was inapplicable, relying upon a ground which had not been argued before us and which was advanced in this litigation for the first time on appeal (391 U.S. at 95 fn. 8). Upon remand, we are now required to pass upon petitioners' alternative contentions not heretofore adjudicated and to determine whether they are entitled to prevail either under section 354 or section 346. We hold that neither section 354 nor section 346 is applicable, and that accordingly the Commissioner's determination must be sustained.

## I. Applicability of Section 354

The sale by Pacific of the Northwest stock to its stockholders at $16 a share at a time when that stock had a fair market value of somewhat in excess of $26 a share represented a distribution of Pacific's property to the extent of the difference. And as has previously been established in this litigation, see above, that distribution must be treated as a taxable dividend unless some provision of the 1954 Code commands otherwise. The principal provisions now relied upon by petitioners are contained in section 354, which provides:

---

[3] See also dissenting opinion of Judge Friendly in the Second Circuit (382 F. 2d at 510).

[4] The record established that Pacific had sufficient earnings and profits to support the treatment of such spread as dividends in respect of the stock owned not only by petitioners but also by all other shareholders of Pacific.

SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

(2) LIMITATION.—Paragraph (1) shall not apply if—

(A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or

(B) any such securities are received and no such securities are surrendered.

\*       \*       \*       \*       \*       \*       \*

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

(2) Cross Reference—

For special rules for certain exchanges in pursuance of plans of reorganization within the meaning of section 368(a)(1)(D), see section 355.

Petitioners contend that the Northwest stock which they received and which comprehended the dividend charged to them by the Commissioner were received in an exchange governed by section 354(a)(1), with the result that the gain reflected in such stock was entitled to nonrecognition.

Assuming *arguendo* that the transaction before us qualifies as a "reorganization" within the definitional provision of section 368(a)(1)—a matter upon which we shall comment hereinafter—it seems clear to us that section 354 does not give petitioners the nonrecognition which they seek. This is so for any one of a number of reasons. We shall set forth several of them.

1. Section 354(a)(1) is applicable only "if stock or securities in a corporation a party to a reorganization are \* \* \* exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization." These provisions by their very terms do not fit this case. Granted that petitioners received solely stock of Northwest, a party to the reorganization, there was no "exchange" of "stock or securities" therefor. This was simply a case of a *sale* of Northwest stock at $16 a share pursuant to an offer made by Pacific that was embodied in the rights or warrants that had been issued to its stockholders. They gave up nothing. They merely paid $16 a share for the Northwest stock which they acquired.

Certainly, petitioners *exchanged no* "stock or securities" to obtain the Northwest shares, an explicit requirement of the statute. In an attempt to escape from the unhappy consequence of this situation, however, petitioners argue (a) that they in fact did exchange securities (at least in part) for the Northwest shares when they surrendered their rights and (b) that "an exchange of stock under section 354 can occur where no stock certificates leave the hands of the exchanging shareholders or come into their hands from the acquiring corporation." We think there is no merit to either of these points.

(a) The Ninth Circuit has already held in this litigation that "Stock rights are not stocks or securities." 382 F. 2d at 492. Cf. *William H. Bateman*, 40 T.C. 408; *Helvering* v. *Southwest Corp.*, 315 U.S. 194. To be sure, rights have been held in certain circumstances to be the equivalent of stock, cf. *Carlberg* v. *United States*, 281 F. 2d 507 (C.A. 8); *James C. Hamrick*, 43 T.C. 21; but the particular instruments involved in those cases represented direct contingent interests in the respective corporations and were not options to purchase stock. In any event, we regard as far more authoritative here the Ninth Circuit's views which were announced when considering the very rights before us now. While the matter under consideration then was the term "stock or securities" in section 355(a)(1)(A), we think that a like meaning must be accorded to that term in the closely related provisions of section 354, regardless of whether these words may be interpreted differently in a different part of the Code or in a different context.

As petitioners themselves have stated in another connection in their brief, the rights issued by Pacific were "merely offers," and "Their sole purpose and effect was to act as a vehicle for the transfer of the Northwest stock to the Pacific shareholders, conditioned on their payment of cash to Pacific." Although petitioners undoubtedly transmitted their pieces of paper embodying the rights to Pacific (or its fiscal agent) when they purchased the Northwest stock at $16 a share, they were merely accepting Pacific's offer to sell the stock at that price, and were not "exchanging" securities, even in part, for such Northwest shares.

(b) Nor is there any substance to petitioners' contention that an "exchange" can occur under section 354 even where no stock certificates leave the hands of the exchanging stockholders. Petitioners cite in this connection a number of cases, of which *Commissioner* v. *Morgan*, 288 F. 2d 676 (C.A. 3), and *James Armour, Inc.*, 43 T.C. 295 are typical. They arise in an entirely different context, and hold in substance, for example, that where the sole stockholder of the transferor is already the sole stockholder of the transferee, additional stock of the transferee need not be issued to him or to the transferor because the exchange requirement does not call for such "meaningless gesture"

(*James Armour, Inc.*, 43 T.C. at 307). No such unusual circumstances are present here that could justify ignoring the plain requirement of the statute that there be an exchange of "stock or securities" for the Northwest stock which petitioners received.[5]

2. We now consider what we previously assumed *arguendo*, namely, whether there was compliance with the underlying requirement of section 354 that there be a "reorganization" in order to bring into play the specific nonrecognition provisions of section 354. For these purposes the term "reorganization" is defined in section 368(a)(1), which sets forth six types of corporate readjustments that can qualify as "reorganizations." These are contained in six separate subparagraphs identified respectively from (A) to (F). Petitioners contend that the transaction before us qualified as a "reorganization" under either (D) or (F). In our view, there was neither a (D) nor an (F) reorganization here.

(a) Section 368(a)(1)(D) defines a (D) reorganization as follows:

(D) a transfer by a corporation of all or a part of its assets to anther corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

These provisions incorporate by reference sections 354, 355, and 356, and it is only section 354 that is pertinent in this case. But here again the plain words of section 354 are fatal to petitioners' position. In this connection section 354(b) provides:

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

---

[5] Such exchange of Pacific stock would not have been a meaningless gesture. The rights were not issued in strict accordance with stock ownership in Pacific, for A.T. & T. received no rights in respect of its preferred stock and it received a diminished number of rights in respect of its common shares of Pacific, the difference being allocated to the minority preferred. The manner in which the transaction was carried out did in fact permit some distortion as among the various stockholders. Moreover, the record shows that only some 65 percent of the 38,000 minority stockholders (in respect of some 88 percent of the outstanding minority stock) exercised their rights; most of the remaining rights were sold, thus permitting strangers to become stockholders of Northwest, and a small percentage of the rights lapsed without exercise. Although the ultimate difference in terms of percentages of stock ownership was perhaps minor, a large number of shareholders were nevertheless involved and there is no basis for ignoring the plain words of the statute on the extraordinary ground that to comply with it would have been a "meaningless gesture."

These provisions explicitly rule out nonrecognition in respect of an exchange pursuant to a plan or reorganization under section 368(a)(1)(D) unless two specific conditions are satisfied. And in this case neither of those conditions has been met.

(i) The first condition demands that the corporation to which the assets are transferred (Northwest) acquire "substantially all of the assets of the transferor [Pacific] of such assets." In the present case, however, Pacific transferred only the Oregon-Washington-Idaho business to Northwest, retaining for itself the California business, and the record indicates that the transferred business constituted only about 20 percent of Pacific's entire operations. Surely, it would require an extraordinary flight of fancy to characterize the transferred assets as comprising "substantially all" of Pacific's assets. To be sure, as we recognized in *John G. Moffatt*, 42 T.C. 558, 578, affirmed 363 F. 2d 262 (C.A. 9), certiorari denied 386 U.S. 1016, the term "substantially all" is a relative term dependent on the facts of any particular situation, and it may apply to a transfer of all of the corporation's business assets even where certain nonoperating assets are retained by the transferor. But that case and others similarly relied upon by petitioners are wholly out of point here. For in the present case, Pacific retained the great bulk of its *operating* assets, namely, those relating to the conduct of its California business. We find no basis in the statute to support petitioners' unusual view that the "substantially all" requirement is met if only the transferor conveys all the assets of *a* business (here the Northwest business) while retaining the operating assets pertaining to the conduct of its remaining business. The statutory language does not permit so distorted a reading. Cf. *Edward H. Russell*, 40 T.C. 810, affirmed per curiam 345 F. 2d 534 (C.A. 5).

(ii) The second condition of section 354(b)(1) requires that the "stock, securities, and other properties" received by the transferor (Pacific) "as well as the other properties of such transferor" be distributed in pursuance of the plan of reorganization. There has been failure to comply with this condition in at least two respects. *First*, among the "other properties" received by Pacific from Northwest was a $200 million note, and this was not distributed. *Second*, Pacific did not distribute its own "other properties." We find unconvincing petitioners' attempt to explain away these vital deficiencies in their position.

Accordingly, failure to comply with the various requirements of section 354 in this case automatically precludes the existence of a (D) reorganization by reason of the very terms of (D) itself which require that the transactions qualify under section 354.[6]

---

[6] The transaction may also qualify under sec. 355 or 356. But it has already been held by the Supreme Court that sec. 355 is inapplicable here, and petitioners have not contended that sec. 356 governs apart from the applicability of sec. 354.

Moreover, as a result of the first condition in section 354(b)(1), it can be seen that no spin-off is entitled to nonrecognition under section 354 as a (D) reorganization, and the Government has argued that Congress intended that all divisive reorganizations must go through the route of section 355 in order to achieve nonrecognition. There is much force to this position. As recounted herein by the Ninth Circuit (382 F. 2d at 491), Congress in 1934, recognizing the potential for widespread tax avoidance, completely eliminated the provisions permitting tax-free spin-offs. There the matter stood until 1951, when in response to legitimate business needs, it was decided to reinstate the tax-free character of the spin-off, subject, however, to carefully formulated conditions that were intended to be safeguards against abuse. These new provisions, as substantially revised and expanded, were included in section 355 of the 1954 Code. It would seem highly persuasive that Congress, showing so much concern for preventing tax abuse through utilization of the spin-off device, understood that nonrecognition in connection with a spin-off or other divisive reorganizations could be achieved exclusively by compliance with the specially formulated safeguards set forth in section 355 and could not be attained by alternate routes such as section 354. The basic purpose of the detailed restrictive conditions in section 355 would be defeated if distributions in connection with divisive reorganizations were allowed to qualify under section 354, and evidence of congressional intention in this respect is found in the very enactment of section 354(b)(1). The Government relies upon certain legislative history in support of this view. See also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 492–493 (2d ed. 1966).

Further evidence of the legislative intention that section 355 be the exclusive test for divisive reorganizations is found in section 368 (a)(2)(A) which provides that transactions qualifying as both (C) and (D) reorganizations shall be treated as only (D) reorganizations. The Senate Finance Committee explained this provision as follows (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 274):

Your committee intends by this rule [sec. 368(a)(2)(A)] to insure that the tax consequences of the distribution of stocks or securities to shareholders or security holders in connection with divisive reorganization will be governed by the requirements of section 355 relating to distribution of stock of a controlled corporation.

Thus, if section 355 provides the exclusive avenue to nonrecognition in connection with a spin-off or other divisive reorganizations, petitioners must fail in their claim to tax-free acquisition of the Northwest stock in the bargain purchase before us, since the Supreme Court has already ruled that section 355 is inapplicable here. However, we need not pass upon this point, for it is clear to us that section 354 in any event does not provide the nonrecognition which petitioners seek.

(b) Nor is the necessary existence of a "reorganization" supplied by section 368(a)(1)(F) which defines a reorganization as including "(F) a mere change in identity, form, or place of organization, however effected."

Relying upon the considerations discussed above the Government argues that Congress did not regard any divisive reorganizations as qualifying under (F). In its reply brief it states:

Since Congress clearly intended to funnel divisive changes in corporate structure through Section 355 via Section 368(a)(1)(D), the fact that Congress did not also mention Section 368(a)(1)(F) in Section 368(a)(2)(A) proves that Congress did not conceive that such changes could be considered "F" reorganizations. Acceptance of the petitioners' contention on this point would result in the destruction of Congress' carefully designed method for determining the tax consequences of distributions incident to divisive changes in corporate structure.

Here too, although this argument appears to be persuasive, we need not go that far in this case, for we think that in any event there was no "mere" change in identity, form, or place of organization. The changes involved were far too substantial to satisfy the "mere" requirement.

In *Estate of Bernard H. Stauffer*, 48 T.C. 277, we gave careful and extensive consideration to the definition of an (F) reorganization. While it is true that we were reversed in that case, 403 F.2d 611 (C.A. 9), we do not find it necessary here to reexamine the conclusions which we reached there, because, in our view, the restructuring of Pacific's business was of such fundamental character that it could not qualify in any event as a "mere" change in identity, form, or place of organization.

It must be remembered that the division of Pacific into two corporations was brought about primarily by the vast expansion of Pacific's business, with the concomitant necessity of providing separate, independent management for that segment of the operations that was conducted in the three northwest States. After the corporate readjustment neither Pacific's officers nor its board of directors would be in control of the Northwest business. Northwest was created as an entirely new corporation with independent control and supervision of the telephone and communications business in the Oregon-Washington-Idaho territory. It became completely separated from Pacific, and conducted its business autonomously, wholly free from Pacific's control. And indeed there were even changes in stockholdings. To be sure, A.T. & T. continued to be the majority and dominant stockholder, but it must also be recalled that there were some 38,000 minority stockholders, and that there were numerous shifts in such minority holdings. Accordingly, regardless of *Stauffer*, we find on this record that,

considering the changes in the aggregate, they were so basic as to preclude the conclusion that there was a "mere" change in identity, form, or place of organization under (F). For this reason, as well as the others discussed above, we hold that petitioners have failed to bring themselves within the nonrecognition provisions of section 354.

## II. Applicability of Section 346

Petitioners contend that if section 354 does not apply to the transactions involved herein, then the distribution of the Northwest stock should be treated as one made in partial liquidation within the meaning of section 346, in particular section 346(b). Section 331(a)(2) provides that amounts "distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock." Thus if section 346 applies here petitioners' gain will be taxable as capital gain. Secs. 1001, 1201, 1221. We hold that section 346 is inapplicable.

Section 346 provides in pertinent part:

SEC. 346. PARTIAL LIQUIDATION DEFINED.

(a) IN GENERAL.—For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—

(1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or

(2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).

For purposes of section 562(b) (relating to the dividends paid deduction) and section 6043 (relating to information returns), a partial liquidation includes a redemption of stock to which section 302 applies.

(b) TERMINATION OF A BUSINESS.—A distribution shall be treated as a distribution described in subsection (a)(2) if the requirements of paragraphs (1) and (2) of this subsection are met.

(1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.

(2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.

Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation.

(c) TREATMENT OF CERTAIN REDEMPTIONS.— * * *

The Commissioner urges that section 346 is inapplicable for a number of reasons. We consider only several of them.

1. Since there was no redemption of Pacific shares, the Commissioner contends that section 346 can be of no avail to petitioners. Petitioners, on the other hand, argue that a redemption is not required. They rely upon section 346(b) as providing the exclusive test here, and since section 346(b) makes no mention of redemption they conclude that none is necessary. The Commissioner counters by pointing out that a redemption is required by section 346(a)(2), and takes the position that section 346(b) was intended merely to define a specific instance of a distribution "not essentially equivalent to a dividend" within the meaning of section 346(a)(2) and was not intended to dispense with the redemption and other requirements of section 346(a)(2), the operative provisions involved.

It must be admitted that section 346 as a whole, and the introductory sentence of subsection (b) in particular, are not wholly free from ambiguity. That sentence reads "A distribution shall be treated as a distribution described in subsection (a)(2) if the requirements of paragraphs (1) and (2) of this subsection are met." If Congress meant to say, as petitioners contend, that the satisfaction of (b)(1) and (2) alone results in a distribution in partial liquidation, it would seem that Congress would have made (b) an operative provision like (a)(1) and (a)(2) rather than by routing its operative effect through (a)(2). If on the other hand section 346(b) merely provides a "nonequivalence to a dividend" safe-harbor to be applied through (a)(2), as the Commissioner contends, it would have been an easy matter to begin (b) by saying "a distribution shall be considered not essentially equivalent to a dividend for the purpose of subsection (a)(2) if—." Compare secs. 302(b)(1) and 302(b)(2). We must of course deal with the actual language of the statute, however unsatisfactory it may be. We have not been referred to any case dealing with section 346(b), and the legislative history of the section does not provide a conclusive answer to our problem. We find, however, that the Commissioner's reading of the statute is more consistent with its purpose than is the petitioners' interpretation.

Section 346(b) does not stand alone, and it is not operative by its own force. Rather, it sets forth certain criteria whereby a distribution is to be governed by subsection (a)(2). But the problem which gave particular difficulty in determining whether a distribution fell within (a)(2) was whether it was "essentially equivalent to a dividend." And the provisions of (b) were enacted to remove that troublesome question

provided that certain specified conditions were met.[7] In our view, section 346(b) merely describes a distribution that will automatically be considered as "not essentially equivalent to a dividend" within the meaning of (a)(2). The latter contains the operative provisions of the statute which we think cannot be ignored, one of them being a requirement that there must be a redemption—a wholly reasonable and easily ascertainable condition for a partial liquidation. Unless (a)(2) and (b) are thus construed in an interdependent relationship there would have been no point whatever in making the effectiveness of (b) flow from the operative provisions of (a)(2); rather (b) by its own force would have required the result which petitioners claim for it.

Further, the test of section 346(b)—the cessation of an active business—was prior to the 1954 Code a major judicial test for determining whether a distribution was "essentially equivalent to a dividend" under section 115(g) of the 1939 Code. See Bittker & Redlich, "Corporate Liquidation and the Income Tax," 5 Tax L. Rev. 439, 465–473, and the cases cited therein at fn. 131, p. 471. Section 346(b) was designed to provide in specific terms a definition of a corporate contraction that would in all cases satisfy in that respect the test of a partial liquidation. But we can see no reason (and none has been called to our attention) why Congress would intend to dispense with the condition that there be a redemption of stock.

In sum, we agree with the Commissioner's contention that subsection (a) is the operative portion of section 346 while subsection (b) merely describes a situation in which the dividend nonequivalence test of section 346(a)(2) is met without further inquiry. The other requirements of that section, including the redemption requirement, must still be met. As previously indicated, we must interpret the statute as we find it, clumsy draftsmanship and all, and it is our best judgment, taking into account the reason for enacting (b) as well as its dependence upon (a)(2) for operative effect, that this is what Congress intended.

Petitioners go on to argue, however, that recent cases under section 346(a)(2) show that no actual surrender of shares is necessary to have a "redemption." Petitioners rely primarily on *Fowler Hosiery Co.*, 36

---

[7] That this was the purpose of (b) is confirmed in "Summary of the New Provisions of the Internal Revenue Code of 1954," a published document prepared by the Staff of the Joint Committee on Internal Revenue Taxation. At p. 38 of that Summary, referring to sec. 346(b), it is stated: "The statute further describes one kind of distribution which is deemed not to be essentially equivalent to a dividend and, therefore, qualifies as a partial liquidation." While the Summary does not have the authoritative force that may be attributed to reports of the congressional committees themselves, it is helpful in an effort to understand the background of the legislation. This is particularly so in connection with the 1954 Code which represented a mammoth undertaking by Congress to enact the most comprehensive revision of the tax laws in history, an undertaking in which the staffs of the committees played an important role.

T.C. 201, affirmed 301 F. 2d 394 (C.A. 7). That case involved a payment from a subsidiary to its parent. After finding that the distribution was made pursuant to a plan of liquidation, the Court faced the fact that no stock was surrendered. We found that fact to be immaterial because there was only one shareholder whose interest would remain the same regardless of how many shares of stock were surrendered. 36 T.C. at 221.

Some cases under the 1939 Code involved much discussion of what would satisfy the "cancellation and redemption" requirement of section 115(i) of that Code, the ancestor of section 346. Compare *John K. Beretta*, 1 T.C. 86, affirmed 141 F. 2d 452 (C.A. 5), certiorari denied 323 U.S. 720, with *Bynum* v. *Commissioner*, 113 F. 2d 1 (C.A. 5), and *Commissioner* v. *Straub*, 76 F. 2d 388 (C.A. 3). The present statute, however, does not contain the term "cancellation,"[8] and we think that *Fowler* quite properly regarded an actual surrender as meaningless in a sole-shareholder situation. The Commissioner himself in a series of rulings has shown an appreciation that in a prorata distribution situation the surrender of stock certificates is a purely formal act. In Rev. Rul. 56–513, 1956–2 C.B. 191, it was held that in determining the amount of gain realized in a distribution in partial liquidation the actual amount of stock surrendered is of no significance, but rather an amount of stock shall be *deemed* to have been surrendered which bears the same proportion to the total number of shares outstanding as the amount distributed bears to the net corporate assets prior to the distribution. See also Rev. Rul. 68–348, 1968–2 C.B. 14; Rev. Rul. 59–240, 1959–2 C.B. 112; Rev. Rul. 57–334, 1957–2 C.B. 240.

Nevertheless, granting the correctness of the *Fowler* principle, that principle was based on the fact of a strict prorata distribution, which was not the case here. Since the rights were not distributed pro rata and since some of the rights were sold, there would not have been a prorata redemption of shares had Pacific shares been surrendered for Northwest shares. Thus, an actual redemption would not have been meaningless. Since there was no actual or constructive redemption, the distribution of the Northwest stock cannot be treated as a distribution in partial liquidation under section 346.

2. We also agree with the Government's alternative contention that section 346(b) is inapplicable for the further reason that Pacific did not distribute all the proceeds of the transfer to Northwest. We hold that section 346(b) properly construed, does require a com-

---

[8] It should be noted that the definition of "redemption" in sec. 317 applies only to part 1 of subch. C, which does not include sec. 346.

plete distribution of the proceeds attributable to the corporate contraction. Section 346(b)(1) covers two types of distributions: (1) One that "is attributable to the corporation's ceasing to conduct * * * a trade or business," etc., and (2) one that "consists of the assets of, a trade or business," etc. The first type deals with proceeds and the second deals with assets. The second speaks of "*the* assets," not merely "assets," and the inference is clear that the meaning is *all* the assets. Since the two types of distribution are clearly meant to be parallel, we must conclude that *all* the proceeds must be distributed as well. Cf. sec. 1.346-1(b)(2), Income Tax Regs. This interpretation serves the purpose of the section: if all the proceeds of the transfer of an active business are not distributed to the shareholders, the shareholders would still have an interest in the transferred business inherent in their stock in the transferor, and the rationale for giving a distribution capital gains treatment would not be present.

This interpretation is borne out by the legislative history. The Senate report, speaking of section 346(b), states: "Under this rule, if a corporation is engaged in two or more active businesses which has [sic] been carried on for at least 5 years, it may distribute *the* assets of either one of the businesses in kind, or *the* proceeds of their sale." (Emphasis added.) S. Rept. No. 1622, 83d Cong., 2d Sess., p. 49. See also *id.* at 262. Further, the Senate version of section 346(b) was based on section 336(a) of the House version of the 1954 Code (H.R. 8300, 83d Cong., 2d Sess.). The House provision required the distribution in partial liquidation to be "attributable to the complete termination of one of at least two businesses." The House report on that section stated:

The requirement that the distribution be "attributable to" the complete termination of a business is intended to mean that the assets distributed are *all of those*, but only those, which were necessary to the conduct of the business terminated or were received in exchange for all or part of such assets upon a disposition in connection with the liquidation. [Emphasis added. H. Rept. No. 1337, 83d Cong., 2d Sess., p. A112.]

While the House provision was quite different from that ultimately enacted as section 346, the words "attributable to" as defined in the House report are used in the same manner as in the section as enacted, and there is no reason to believe that they were intended to have a different meaning in the section as enacted. See also Mertens, Law of Federal Income Taxation, Code Commentary, vol. 1, sec 346(b):2 (commenting on sec. 346(b)):

Apparently, all the assets of the business which were [sic] conducted during the five-year period must be distributed. In other words, although all of such assets may have been sold, it does not appear that only half of the proceeds of the sale

may be distributed and the other half retained for reinvestment in the active business which is still conducted by the distributing corporation.

Pacific failed to distribute all the proceeds of the transfer to Northwest in three respects. First, the $200 million demand note was not distributed. Second, the payment by Pacific shareholders of $16 per Northwest share in effect constituted the retention by Pacific of a substantial amount of the proceeds of the transfer to Northwest. Finally, the Northwest stock was distributed in two steps. The Supreme Court dealt with the problems caused by the separate distributions in connection with section 355. We need not decide, however, whether the Supreme Court's reasoning concerning that section applies also to section 346. Suffice it to say that the two distributions cannot be regarded as one transaction in the present context because section 346(a)(2) requires a distribution pursuant to a plan and occurring no later than the taxable year following the adoption of the plan. It is clear that the second distribution here (in 1963) did not fall within such a period.

### III. Four Rights Sold By The Gordons

Petitioners Gordon appear to attempt to reopen the question as to the proper tax treatment of the $6.36 proceeds which they received upon their sale of the four residual rights. Our decision in this respect was reversed by the Second Circuit which in turn was reversed by the Supreme Court. The issue in respect of these four rights was raised only in the Gordons' appeal to the Second Circuit, and in its mandate to us, following the Supreme Court's decision, it was "ordered, adjudged and decreed that on the Taxpayer's appeal said order [the order of this Court] be and it hereby is affirmed." We do not regard the issue relating to the sale of the rights as being open any longer.

---

The Government has made an extensive argument on remand in connection with all the rights distributed by Pacific, to the effect that the dividend income taxable to the stockholders is the value of the rights upon distribution rather than the spread between the value of the Northwest shares and the $16 purchase price as of the date of the bargain purchase. The deficiencies herein were determined on the basis of the latter theory, and the Commissioner has not sought to amend his pleadings to ask for any increased deficiency based upon his revised theory. In the circumstances, we do not consider it, and we do not reexamine the conclusions stated by us in this respect when these cases were previously here. 45 T.C. at 87.

*Decisions will be entered under Rule 50.*