**Irving GORDON and Margaret Gordon, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 316, Docket 33772.**

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1970.

Decided March 16, 1970.

Harry R. Horrow, Stephen J. Martin, Pillsbury, Madison & Sutro, San Francisco, Cal., for petitioners-appellants.

Lee A. Jackson, Gilbert E. Andrews, Attys., Dept. of Justice, Johnnie M. Walters, Asst. Atty. Gen., for respondent-appellee.

Before WATERMAN and ANDERSON, Circuit Judges,. and BARTELS, District Judge.[*]

WATERMAN, Circuit Judge:

By this appeal this case reaches our court for the second time. The taxpayers, husband and wife, were minority shareholders in the Pacific Telephone and Telegraph Company (Pacific), 89% of the stock of which was owned by the American Telephone and Telegraph Company (A T & T). Pacific, a California corporation, did business not only in that state but also in Oregon, Washington, and Idaho. In 1961 the management of Pacific decided to simplify its administration by dividing Pacific into two corporations, each of which would be owned directly by Pacific's contemporary shareholders. Pacific would transfer to a new company all its operations outside California. Considerations of state law led the management to decide against distributing stock in the new corporation pro rata to the shareholders, whether or not in redemption of Pacific shares which they held.[1] Instead, it was decided to create a new subsidiary of Pacific, called the Pacific Northwest Bell Telephone Company (Northwest), a State of Washington corporation. In return for receiving Pacific's assets in Washington, Oregon, and Idaho, Northwest issued all its stock to Pacific and also assumed a proportionate share of Pacific's long term debt by issuing a demand promissory note to Pacific for $200,000,000.[2]

This plan of reorganization was adopted in 1961 by the shareholders.

The plan required Pacific to offer its Northwest stock to the Pacific shareholders in two or more offerings. The first of these, to involve more than half the Northwest shares, was to take place shortly after the creation of Northwest. The timing of later offerings would depend on Pacific's need for capital, for the Northwest stock would be offered to the shareholders for cash in connection with the stock rights previously issued to them.

Accordingly, on September 29, 1961, Pacific issued to its shareholders rights to acquire about 57% of the Northwest stock, which rights were to remain valid for three weeks. Six rights plus $16 had to be offered for each share of Northwest. The remaining 43% of the Northwest stock was offered in 1963, at a rate of 8 rights plus $16 per each Northwest share. In these two offerings A T & T exercised all its rights and the owners of half of the remaining 11% of Pacific's shares also exercised their rights. The remaining rights— about 5% of the total—either were not exercised by anyone or were exercised by persons to whom they had been publicly traded by Pacific's minority shareholders.

The present tax dispute grows out of the 1961 offering. The Gordons, who filed a joint return for that year, exercised their rights to acquire 256 shares of Northwest, worth $6656 or $26 per share on the date of exercise. In addition to surrendering their stock rights, they paid the required $16 per share for each of the 256 shares, a total of $4096. The Commissioner sought to tax as a dividend the difference between the cash amount paid and the value received, and the Gordons repaired to the Tax Court. There they argued that the receipt of the

---

[*] Of the Eastern District of New York, sitting by designation.

[1] Pacific did not have enough earned surplus to cover a pro rata distribution of Northwest stock. Apparently such a distribution would have been treated as a dividend under California law. Pacific's brief also states that a redemption of Pacific stock in return for Northwest stock would have required Pacific to redeem all its voting preferred, a redemption which the corporation did not consider feasible.

[2] This note was repaid by Northwest about two years later with funds raised by several issues of its own long term debentures.

Northwest stock was tax free under Sections 355 and 354 of the Internal Revenue Code, or, alternatively, that the amount treated by the Commissioner as a dividend should instead be taxed as a capital gain under Section 346. The Tax Court agreed with the taxpayers that, pursuant to Section 355, the so-called "spinoff" provision, the gain need not be recognized, and therefore that court did not decide taxpayers' claims under Section 354 or 346. The decision of the Tax Court was affirmed by this court, 382 F.2d 499 (2 Cir. 1967). The Supreme Court reversed, however, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968), holding that the requisite control of Northwest had not passed to Pacific's shareholders in 1961, and the case was remanded to the Tax Court for it to consider taxpayers' other claims. After this remand the Tax Court then held, 51 T.C. 1032, that neither Section 354 nor Section 346 is applicable to the situation at bar and accorded the taxpayers no relief. The taxpayers appeal and seek review of this adverse holding. We affirm the Tax Court.

### Section 354

The Tax Court held for two main reasons that the Pacific-Northwest reorganization failed to come within the terms of Section 354 which we have quoted in pertinent part in the margin.[3]

Judge Raum speaking for that court held, first, that the taxpayers had not exchanged "stock or securities" for the Northwest stock which they received, as Section 354(a) (1) requires; and, second, that no reorganization as defined in Section 368 had occurred. See Sec. 354 (b) (1).

We agree with Judge Raum that the stock warrants which taxpayers surrendered for the Northwest stock did not amount to the "stock or securities" which the statute requires be exchanged for the stock and securities being distributed if no gain or loss on the transaction is to be recognized. Appellants cite Miles v. Safe Deposit & Trust Co., 259 U.S. 247, 252, 42 S.Ct. 483, 66 L.Ed. 923 (1922) for the proposition that because stock rights embody the right to receive stock in the future the stock rights represent an equity in the corporation and can reasonably be termed a "stock or security." Cf. Carlberg v. United States, 281 F.2d 507 (8 Cir. 1960); James C. Hamrick, 43 T.C. 21 (1965). Moreover, appellants argue that the rights do not represent an equity interest in Northwest for that corporation had not been formed at the time the rights were issued, but, instead, represent an equity interest in a segregated portion of the assets of Pacific.

We do not find these arguments persuasive. In seeking to define the

3. Sec. 354. Exchanges of stock and securities in certain reorganizations.
   (a) General rule.
   (1) In general.
   No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
   (2) Limitation.
   Paragraph (1) shall not apply if—
   (A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or
   (B) any such securities are received and no such securities are surrendered.
   \*      \*      \*      \*      \*

   (b) Exception.
   (1) In general.
   Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—
   (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
   (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.
   (2) Cross reference.
   For special rules for certain exchanges in pursuance of plans of reorganization within the meaning of section 368(a) (1) (D), see section 355.

stock rights as "securities" taxpayers face a quandary, for securities are expressly defined as "property" by Section 317(a) and a distribution of securities by a corporation to its shareholders is therefore, when distributed, taxable under Section 301 as a distribution of property. It is of no benefit to taxpayers to obtain tax-free treatment of the exercise of their stock rights if the initial distribution to them of these rights is taxable to the extent of the value of the rights when distributed. According to the evidence before us taxpayers' taxable gain would appear to be the same in either case. On the facts here it is of course possible for taxpayers to argue that an equity interest constituting a "security" for purposes of Section 354 may not constitute a "security" for purposes of Section 317, but no justification for drawing such a distinction has been suggested. Indeed, if made, we would reject the argument. Therefore we find it unnecessary to decide whether the stock rights distributed by Pacific constituted securities within the meaning of Section 354.

■ So in order for taxpayers to be benefited by this litigation taxpayers must show that the rights constituted "stock" within the meaning of Section 354(a). We do not agree that they did, for several reasons. First, the qualities which normally typify "stock" do not exist. These warrants represented no present voting or dividend rights in Pacific and represented no right to share, in themselves, in the assets of Pacific if that corporation were liquidated except to the limited extent that Pacific could be compelled to divest itself of Northwest before Pacific were liquidated. In short, the rights were only binding offers to the shareholders of the stock of Pacific's subsidiary. Taxpayers argue that this binding offer to them constituted an enforceable equity in Pacific's assets, and, because an enforceable equity, was stock in Pacific. This argument proves too much. If it were valid, nearly any executory promise of a corporation to convey its assets to another party would constitute "stock" in the promisor corporation. Such a construction flies in the face of normal understanding and usage. Moreover, the Commissioner points out that the stock rights offering did not convey an interest in the undifferentiated total assets of Pacific as stock normally does, but only in a particular segregated portion of those assets. Taxpayers again cite Miles v. Safe Deposit & Trust Co., *supra*, 259 U. S. 247, 252, 42 S.Ct. 483 (1922) for the proposition that distribution by a corporation of stock rights is equivalent to a distribution of stock. However, in that case the corporation distributed rights in its *own* stock. If the case is at all relevant to our case it demonstrates that Pacific's distribution of rights to buy Northwest stock was equivalent to a distribution of Northwest stock, not Pacific stock. Compare Carlberg v. United States, 281 F.2d 507 (8 Cir. 1960) with Commissioner of Internal Revenue v. Baan, 382 F.2d 485 (9 Cir.), aff'd sub nom. Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968). Moreover, Helvering v. Southwest Consol. Corp., 315 U.S. 194, 200–201, 62 S.Ct. 546, 86 L.Ed. 789 (1942) would seem conclusively to dispose of the notion that stock warrants are generally equivalent to the stock of the obligor corporation for purposes other than the purposes treated in Miles v. Safe Deposit & Trust Co., *supra*. In Helvering v. Southwest Consol. Corp., which involved the meaning of "voting stock" for purposes of the reorganization provisions of the 1939 Code, the Court stated:

[T]he warrants which were issued were not "voting stock." Whatever rights a warrant holder may have "to require the obligor corporation to maintain the integrity of the shares" covered by the warrants * * * he is not a shareholder. * * * His rights are wholly contractual. As stated by Holmes, J., in Parkinson v. West End Street Ry., 173 Mass. 446, 448, 53 N.E. 891, 892, he "does not become a stockholder, by his contract, in

equity any more than at law." At times his right may expire on the consolidation of the obligor corporation with another. Id. If at the time he exercises his right there are no authorized and unissued shares to satisfy his demand, he will get damages not specific performance. * * * Thus he does not have, and may never acquire, any legal or equitable rights in shares of stock. * * * And he cannot assert the rights of a shareholder. Id.

We also note that Sections 305 and 317 except from dividend treatment both the distribution of the corporation's own stock and the distribution of rights to acquire such stock, thus codifying the rule set forth in Eisner v. McComber, 252 U. S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920) and in Miles v. Safe Deposit & Trust Co., supra. The fact that the Internal Revenue Code speaks of stock and stock rights separately, even when the rights to obtain stock are rights to obtain stock of the distributing corporation, weighs heavily against taxpayers' assertion that, for tax purposes, the two are the same and there is no distinction between them. Equally important is the fact that these sections, 305 and 317, just cited, mention only rights to acquire stock of the distributing corporation and do not mention rights to acquire shares in the stock of other corporations held in its investment portfolio by the distributing corporation.

We do not understand taxpayers to argue that even if the issue of stock rights to them should be treated for tax purposes as a stock dividend of Northwest stock as opposed to Pacific stock so that Section 354 does not apply, the issuance of such rights would be nonetheless free from taxation either when issued or when exercised because not intended as a distribution of earnings or profits. See Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937) and Choate v. Commissioner of Internal Revenue, 129 F.2d 684 (2 Cir. 1942). Consequently we consider the issue waived and do not

reach the question of the continued validity of these cases under the 1954 Code. See Carlson, Taxation of "Taxable" Stock Rights: The Strange Persistance of Palmer v. Commissioner, 23 Tax L.Rev. 129 (1968).

We find it unnecessary to pass upon the Tax Court's determination that no "exchange" took place within the meaning of Section 354. We recognize that taxpayers' exercise of the stock rights replaced certain legal interests with other legal interests. However, inasmuch as the section speaks of an exchange of stock and securities for other stock and securities, we find it irrelevant whether, in some sort of an abstract way, the surrender of something other than stock or securities amounted to an "exchange."

We now turn to the Tax Court's second principal ground for denying taxpayers the utilization of Section 354, namely, that Pacific was not "a party to a reorganization" within the contemplation of Section 354. More specifically, the Tax Court held that even if a corporate reorganization of some sort did in fact occur, it would necessarily be the kind of reorganization defined by Section 368(a) (1) (D), which Section 354 excludes from tax-free treatment. Section 354(b) reads as follows:

(b) Exception.

(1) In general.

Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

The Tax Court held that these conditions so spelled out in the statute were not met inasmuch as Pacific (1) did not

transfer substantially all its assets to Northwest, and (2) Pacific did not distribute all the stock and securities it received from Northwest in return—namely, the $200,000,000 note and that portion of the Northwest stock which was not distributed until 1963.

On appeal taxpayers do not challenge the Tax Court's ruling that Section 354 is inapplicable if a reorganization is judged to have taken place under Section 368(a) (1) (D). Instead, they argue that the court erred in refusing to denominate the transaction a Section 368(a) (1) (F) reorganization to which the requirements of Section 354(b) do not apply.

We are less certain than the court below that the transaction here could not qualify for some purposes as a reorganization under subparagraph (F) of Section 368(a) (1), namely, as "a mere change in identity, form, or place of organization, however effected." The transaction was motivated by valid business purposes related to more efficient business administration. If the statutory phrase "mere change in form" can be read only to require that the transaction may not principally be used as a dividend mechanism, arguably that condition was met here. Cf. Section 355(a) (1) (B). Although a number of cases have pointed to a complete identity of shareholders before and after the transaction as evidence that the corporation had undergone a mere change in form, see, e.g., Associated Machine v. Commissioner of Internal Revenue, 403 F.2d 622, 625 (9 Cir. 1968); Estate of Stauffer v. Commissioner of Internal Revenue, 403 F.2d 611, 618 (9 Cir. 1968); Davant v. Commissioner of Internal Revenue, 366 F.2d 874, 884 (5 Cir. 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967), it is not clear thus far whether such an identity is an indispensable condition to the invocation of Section 368(a) (1) (F).

However, we do not find it necessary to determine whether this provision can apply to the transaction at bar. Even if subparagraph (F) applies, the transaction in this case is one which would also be a reorganization under subparagraph (D) were it not for the specific limitations which Section 354(b) places on such transactions. We do not believe that these limitations become inapplicable simply because this is the sort of erstwhile (D) reorganization which might also qualify as a "mere change in form."

It seems clear that a reorganization which qualifies as a "mere change in form" under Section 368(a) (1) (F) can qualify under other parts of Section 368 as well. See Estate of Stauffer v. Commissioner of Internal Revenue, *supra* at 617–618. Section 368(a) (1) (D) defines a reorganization as follows:

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356.

This language would include any spin-off where control remained in the parent corporation or its shareholders as long as the shares are distributed in a transaction which qualifies under Section 354, 355, or 356. The cross-reference to Section 354 can produce a kind of *renvoi*, for Section 354(b) in turn states that Section 354 will not apply to reorganizations which qualify under Section 368(a) (1) (D) unless certain conditions are met. If we go behind these circular references in search of the congressional meaning, it seems clear that divisive reorganizations, in which a corporation transfers property to a second corporation, are meant to be granted tax-free status under Section 354 only if the conditions of Section 354(b) are met.

The Tax Court was correct in holding that these conditions were not met. Northwest, the corporation to which the assets were transferred, did not acquire "substantially" all of the assets of Pacific. Nor can it be said that in pursuance of the plan of reorganization Pacific distributed the stock, securities, and other properties which Pacific received. Pacific never at any time distributed the $200,000,000 note it received from Northwest. As to the stock, 43% remained undistributed at the end of the tax year in question, and the corporation had no obligation to distribute the remainder at any definite date in the future. See Commissioner of Internal Revenue v. Gordon, 391 U.S. 83, 95–98, 88 S.Ct. 1517 (1968). Consequently, the transaction failed to meet the requirements of either part of Section 354(b).

These requirements seem to bar the present transaction from the haven of Section 354 even if the transaction can be found to qualify as "a mere change in form" under Section 368(a) (1) (F). If Section 354(b) did not exist, the present transaction would clearly qualify as a (D) reorganization. Equally clearly, Section 354(b) exists to prevent it from so qualifying. Doubtless the reason for this prevention is to insure that all spin-offs will be judged by the standards of Section 355 rather than by the standards of Section 354. To thwart that plain congressional intention by calling the transaction a "mere change in form" would be erroneous. Alternatively, it seems fair to say that a divisive reorganization should not qualify as a mere change in form for purposes of Section 354 unless it meets the standards of either Section 354(b) or Section 355.

We therefore hold that taxpayers may not bring themselves within the non-recognition provisions of Section 354.

*Section 346*

Taxpayers contend that if they are not entitled to the non-recognition provisions of Section 354, they should receive capital gains treatment under Section 346, which section is set forth in the margin.[4] The Tax Court rejected

4. § 346. Partial liquidation defined.
  (a) In general.
    For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if—
      (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or
      (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).
  For purposes of section 562(b) (relating to the dividends paid deduction) and section 6043 (relating to information returns), a partial liquidation includes a redemption of stock to which section 302 applies.
  (b) Termination of a business.
    A distribution shall be treated as a distribution described in subsection (a) (2) if the requirements of paragraphs (1) and (2) of this subsection are met.

      (1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.
      (2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part.
  Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation.

this contention on several grounds, and we agree with the Tax Court.

Taxpayers assert that their transaction, which admittedly does not fit the specifications of Section 346(a) (1), need not fit the requirement of Section 346(a) (2) which specifies that there be a redemption of a part of the corporation's stock pursuant to a plan. They contend that Section 346(b) states that a distribution will fulfill the requirements of Section 346(a) (2) if two conditions are met, and these conditions do not appear to demand that the distribution be a distribution in redemption.

It is true, as the Tax Court recognized, that the function of Section 346(b) is ambiguous. Section 346(a) (2) contains three requirements: nonequivalency to a dividend, redemption of stock, and occurrence of the distribution within the same or succeeding taxable year as that in which the plan of redemptive distribution is adopted. Subsection (b) states that a distribution will be deemed to be one "described in subsection (a) (2)" if two conditions are met: the distribution must be attributable to the cessation of a business which the distributing corporation conducted during the previous five years, and the distributing corporation, after the distribution, must continue in a business which it also conducted during the previous five years. The distribution need not be pro rata to qualify.

It is not altogether clear whether Congress intended that compliance with subsection (b) should waive any further need to comply with the three separate requirements of subsection (a) (2).

However, it is certainly plausible that Congress intended by the enactment of subsection (b) that whenever a corporation ceases a business entirely and distributes the assets or proceeds, the distribution should be regarded as a return of capital even when no redemption takes place and even when the actual distribution is delayed for more than two years despite the (a) (2) provision. Unlike the Tax Court, we do not pass upon this question for we find that the requirements of Section 346(b) have not been met in this case because Pacific failed to distribute or to commit itself to distribute, all the proceeds which it received as a result of its termination of business activities in Washington, Oregon, and Idaho.

Subsection (b) (1) requires that the distribution be "attributable to" the corporation's ceasing to conduct business or, in the alternative, that the distribution consist of "the assets" of the terminated business. We agree with the Commissioner and the Tax Court that the reference to "the assets" clearly implies that all the assets must be distributed in order to qualify. Inasmuch as a distribution "attributable to" a cessation of business is obviously meant to be treated in a fashion parallel to the distribution of assets, we hold that a failure to distribute all such proceeds is fatal to taxpayers' case. The legislative history of the provision supports this conclusion.[5]

This holding draws support not only from linguistic inference but also from policy. Where a corporation ceases to conduct a discrete portion of its business and distributes the entire assets of this

---

5. The Senate Report on Section 346(b) speaks of "the assets" and "the proceeds." S.Rep.No.1622, 83d Cong., 2d Sess. at 49, U.S.Code Cong. & Admin.News 1954, p. 4629. Similarly, the House version of the bill, in an earlier form, stated that "The requirement that the distribution be 'attributable to' the complete termination of a business is intended to mean that the assets distributed are *all of those*, but only those, which were necessary to the conduct of the business terminated or were received in exchange for all or part of such assets upon a disposition in connection with the liquidation." (Emphasis supplied.) H.Rep.No.1337, 83d Cong., 2d Sess. at A112, U.S.Code Cong. & Admin.News 1954, p. 4250.

separate portion or the proceeds thereof to the shareholders, Congress has provided that the distribution be treated not as a return of profits but as a return to the shareholders of part of the capital which they had committed to the original venture. If all the actual capital assets of the business or all the proceeds thereof received by the business from a dispositon of those assets are being distributed this treatment is an eminently logical one. However, between this situation and the hypothetical case where the corporation distributes only a small portion of the assets or the proceeds of their sale, Section 346 draws no line apparent to this court. It seems reasonably clear, moreover, that the hypothetical case just mentioned is not one which deserves to be called a partial liquidation. Indeed, it constitutes nothing more than a reinvestment in another line of business of most of the capital that was used in the terminated business, with the result that there occurs relatively little contraction in the size of the activities of the corporation as a whole. Because the intellectual concept of a partial liquidation is itself a tenuous one and difficult to separate, except by intuition, from the concept of a distribution of profits, we feel compelled to grasp the only certain standard of differentiation which we can see and to require that all the assets of a liquidated business, or all the proceeds thereof, be distributed before the transaction qualifies under Section 346(b). Otherwise, the distributive transaction must meet the somewhat more detailed provisions of Section 346(a) (2).

For these reasons we conclude that the Pacific-Northwest transaction did not meet the requirements of Section 346(b), and, as no redemption occurred, it also failed to meet the requirements of Section 346(a) (2).

Affirmed.