KENTON MEADOWS COMPANY, INC., A WEST VIRGINIA CORPORATION, KENTON MEADOWS AND ACEL I. MEADOWS, HUSBAND AND WIFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kenton Meadows Co. v. Commissioner
Docket No. 9533-77.
United States Tax Court
T.C. Memo 1984-379; 1984 Tax Ct. Memo LEXIS 293; 48 T.C.M. (CCH) 580; T.C.M. (RIA) 84379; July 24, 1984. David K. Higgins and David L. Wyant, for the petitioners. Robert J. Kastl, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: By separate statutory notices of deficiency, respondent determined deficiencies in petitioners' Federal income tax as follows: Taxpayer
Year
Deficiency
Kenton Meadows Company,
1972
$19,695
Inc.
1973
3,051
Kenton Meadows and
1972
64,641
Acel I. Meadows
1973
902
*296 After numerous concessions by both the corporate and individual petitioners, the issues remaining for decision are: (1) whether a distribution in redemption of a portion of petitioner Kenton Meadows' stock in his wholly-owned corporation, Kenton Meadows Company, Inc. (the Company), was pursuant to a partial liquidation of the Company within the meaning of section 346(b), [1] so as to receive capital gains treatment, or was a dividend taxable as ordinary income under sections 301 and 316; (2) whether the Company was required to recognize gain on such distribution under section 311(d); (3) whether the Company may deduct as ordinary and necessary business expenses under section 162 payments made to reimburse petitioner Kenton Meadows (Mr. Meadows) for certain foreign travel expenses; and (4) whether the Company's reimbursement of such expenses constituted a constructive dividend to Mr. Meadows. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto *297 are incorporated herein by this reference. Kenton Meadows Company, Inc. (hereinafter the Company), was incorporated under the laws of the State of West Virginia. The Company's principal office is located in Gassaway, West Virginia, and was located there when the Company filed its petition herein. The Company filed U.S. Corporation Income Tax Returns, Forms 1120, for the 1972 and 1973 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Kenton Meadows and Acel I. Meadows (hereinafter Mr. and Mrs. Meadows) were husband and wife and resided in Gassaway, West Virginia when they filed their joint petition along with the Company in this Court. Mr. and Mrs. Meadows filed joint U.S. Individual Income Tax Returns, Forms 1040, for the 1972 and 1973 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Mr. Meadows was the sole shareholder of all of the issued and outstanding stock of the Company at all times relevant to the issues herein. Mr. Meadows started in the pipeline and road construction business in approximately 1946 and has been continually engaged in such business since that time. His first corporation apparently was Kenton *298 Meadows Company, Inc. (referred to above and hereafter as the Company), which was incorporated on February 23, 1954 and engaged in heavy and highway construction, including some pipeline construction. Meadows Southern Construction Company (hereinafter Southern), was incorporated on March 19, 1956. Again Mr. Meadows was the sole shareholder. The business conducted by Southern included construction of roads and bridges. Elk Valley Land Corporation, another corporation wholly owned by Mr. Meadows, was incorporated on January 6, 1960. This corporation was involved in the business of real estate investment and rentals and also equipment rentals. Meadows Stone & Paving, Inc. (hereinafter Meadows), was incorporated on October 27, 1961, and its business included asphalt paving and sales of quarried stone and asphaltic concrete. Mr. Meadows was the sole shareholder. In the mid-1960's, Mr. Meadows purchased all of the issued and outstanding stock of Pipeline Maintenance & Construction, Inc. (hereinafter Pipeline), which had been incorporated on February 29, 1956. The business conducted by Pipeline included maintenance and construction of pipelines for the gas industry, with emphasis *299 upon what is known in that industry as "cross-country" gas pipelines. In cross-country pipelining, the diameter of the pipe exceeds 10 inches (usually 20 to 30 inches) and the length of the pipeline to be constructed spans several miles. The normal contract price for the type of cross-country jobs performed by Pipeline ranged from $500,000 in the early years to $4,000,000 by 1971, and involved a work force of 150 to 700 laborers. Most of Pipeline's customers were major gas companies. Cross-country pipelining requires some special equipment, in particular, a type of heavy tractor or "pipelayer" with a block and tackle attached to the side, known as a "sideboom." A sideboom is used to raise and lower the heavy, large-diameter pipe in and out of the ditch to perform work thereon, such as welding, and for installation purposes. Caterpillar pipelayer Models 572 and 583 are two types of sidebooms. Sidebooms are not adaptable for use in other types of construction, unless the job requires lifting or lowering something like heavy pipe sections. During the years prior to its merger with the Company, which will be discussed below, Pipeline did not own the sidebooms it used but rented *300 them from others. The record does not indicate whether Pipeline rented its sidebooms from the Company, from another of Mr. Meadows' corporations, or from third parties.Pipeline did own some equipment on which it claimed depreciation deductions, but the record does not indicate exactly what equipment it owned at the time of the merger. In addition to the sidebooms, other types of equipment, such as excavating equipment, backhoes, dozers, trucks, winches, and various smaller tools are also used on cross-country pipeline jobs. However, such equipment is multipurpose and could be and was used in other types of construction work. The Company owned various types of construction equipment, including certain sidebooms. For example in 1968 the Company sold two No. 572 sidebooms and in 1971 it sold a No. 583 that it had acquired in 1969. During its 1969 taxable year, the Company borrowed large sums of money, [2] which it used to purchase various pieces of construction equipment, including five sidebooms, various other types of tractors, excavating equipment, dozers, graders, backhoes, and Mack trucks. Among the sidebooms were one Caterpillar Model No. 572 and three Caterpillar Models *301 No. 583, plus another model which may have been smaller. The equipment thus purchased also served to collateralize the loans. The loans were obtained by the Company and investment tax credits for some of the new equipment were claimed by the Company. The record does not indicate whether any of this equipment was used in the equipment rental business, but it appears that the equipment was jointly used by the Company, Pipeline, Southern, and Meadows, both before and after the merger of these companies. On January 1, 1970, Pipeline, Southern, and Meadows were all merged into the Company. The reasons underlying the merger were to facilitate the acquisition of performance bonds needed for the various construction contracts and also to simplify audit and the financial statements of the various companies. Pursuant to the mergers, Mr. Meadows received additional stock in the Company in exchange for his stock in Pipeline, Meadows, and Southern. [3] Prior to the mergers, the Company's business had included heavy construction (including *302 both pipeline construction and road construction), general contracting, and equipment rental. Subsequent to the mergers, the Company's business included those same activities in addition to those previously conducted by Pipeline, Meadows, and Southern. During the early part of 1970, the Company was experiencing difficulty in obtaining performance bonds for several cross-country pipeline jobs upon which it had submitted bids. Because of its large debt obligations incurred to purchase construction equipment and the resulting shortage of cash or other liquid assets, several bonding companies had rejected the Company's application for the required performance bonds, citing insufficient working capital as the reason. The Company then contacted a Mr. Bill Wymer, a bonding agent representing several bonding companies in the United States. Mr. Wymer, along with the bonding company he represented in the transaction, recommended to Mr. Meadows that he transfer to the Company certain marketable securities he owned individually, thereby increasing the Company's working capital and facilitating acquisition of the necessary *303 performance bonds. Pursuant to this recommendation, Mr. Meadows transferred share certificates representing 80 shares of the Bank of Gassaway to the Company on December 10, 1970, [4] and transferred share certificates representing 70 shares of the Home National Bank of Sutton to the Company on December 25, 1970 (hereinafter collectively referred to as the bank stock). At the time of the transfer of the bank stock, Mr. Meadows had a combined basis in the 150 shares of $84,350. In return for the bank stock, the Company issued share Certificate No. 2, representing 550 shares in the Company, to Mr. Meadows on December 10, 1970. The required performance bonds were obtained by the Company shortly thereafter. At the time of the transfer of the bank stock to the Company and thereafter, Mr. Meadows regarded the bank stock as his and intended that as soon as the need for the stock for bonding purposes passed that the bank stock would be returned to him. *304 During the latter part of 1971, the demand for cross-country pipeline work declined in the United States, particularly in the eastern part of the country.Upon completion in 1971 of its work under contract, the Company was unable to locate additional cross-country pipeline work in the United States. Accordingly, the Company decided to sell certain sidebooms that were being used only with respect to cross-country pipeline jobs. Since the demand for cross-country pipeline construction had essentially dried up in the United States, the sidebooms were sold in Mexico.On January 12, 1972, the Company sold five sidebooms for a total of $182,500. On March 31, 1972, the Company sold two more sidebooms for a total of $55,734. All seven of the sidebooms sold had been purchased by the Company prior to 1970, one in 1967, three in 1968, and three in 1969. All of the sales proceeds were received in cash, which the Company then used to discharge outstanding loan obligations which had been incurred in 1969 to purchase three of these sidebooms and the other construction equipment for the Company's operation. As the Company no longer required the large performance bonds for the large cross-country *305 pipeline jobs, the bank stock previously transferred to the Company by Mr. Meadows was distributed to him in redemption of the 550 shares of the Company's stock previously received in exchange therefor. The 550 shares of the Company's stock were cancelled. On January 14, 1972, Stock Certificate Nos. 521 and 244 in the name of the Company, representing 70 shares of the Home National Bank of Sutton and 80 shares of the Bank of Gassaway, respectively, were transferred from the Company and into the name of Mr. Meadows, individually. The combined fair market value of the stock when transferred to Mr. Meadows was $107,000. At no time relevant to the issues in this case was a Form 966, or any document containing the information required by said form, filed by or on behalf of the Company. The Company did not, at any time relevant to the issues in this case, adopt or formulate a written plan or resolution for the liquidation of the whole or any part of its capital stock. On June 2, 1972, the Company purchased for $52,000 a sideboom similar to the ones sold in January and March of 1972. However, this specific sideboom has never been used by the Company in any sort of pipelining job, *306 instead being rented out to a railroad company for use in righting derailed railroad cars. KMS, Inc., was incorporated on October 17, 1972. The business of KMS, Inc., includes general construction and equipment rental. The Company was the sole shareholder of all issued and outstanding stock of KMS, Inc. That stock was originally issued to the Company in consideration for the transfer of equipment to KMS, Inc., by the Company. The record does not indicate whether the equipment so transferred included that purchased by the Company in 1969, including the other remaining sideboom. Since 1972, the Company has not performed any cross-country pipeline work. However, the Company has performed smaller pipelining work, known as "utility" or "station" (hereinafter station) jobs. Such work involves pipes of smaller diameter and shorter distances, requiring less heavy equipment and manpower than cross-country pipeline construction. Such work is known as station work because it is performed close to the utility company's pump stations or compression stations. The Company has performed two station jobs since 1972, one in North Carolina and one in Kentucky. The Company's capital position *307 over the years was as follows: Capital
Capital
Retained
Date
Stock
Surplus
Earnings
Total
December 31, 1969
$25,000.00
$580.00
$136,104.00
$161,684.00
December 31, 1970
150,000.00
433,330.00
540,253.00
1,123,583.00
December 31, 1971
150,000.00
370,530.00
575,656.00
1,096,186.00
December 31, 1972
95,000.00
341,180.00
558,605.00
994,785.00
December 31, 1973
95,000.00
341,180.00
559,617.00
995,797.00
December 31, 1974
95,000.00
341,180.00
750,713.00
1,186,893.00
December 31, 1975
95,000.00
341,180.00
1,042,002.00
1,478,182.00
In 1972 and 1973, Mr. Meadows took what may best be described as an "around the world" trip, accompanied by Mrs. Meadows and one of their children. A travel agency arranged their travel plans. [5] Among the places visited by Mr. and Mrs. Meadows and their child on this trip were Venezuela, Guatemala, El Salvador, Chile, Brazil, Denmark, Germany, France, and Australia. [6]
*308 Mr. Meadows' stated purpose for this and other trips was to locate new cross-country pipeline construction contracts, since the demand for such work in the United States had drastically declined. Mr. Meadows did obtain a Certificate of Registration of Foreign Company from Australia [7] issued in the Company's name, and also enrolled the Company as a Member of the Australian Pipeline Industry Association. The papers necessary to obtain a similar certificate may have been filed in Venezuela, but, if so, the record does not reveal whether a Venezuelan certificate was ever issued. [8]
*309 The Company fully reimbursed Mr. Meadows for all the expenses he and his family incurred on the 1972-1973 trip and deducted such amounts on its 1972 and 1973 corporate income tax returns. The total amount of such reimbursement and corresponding deduction was $15,634 and $1,954 for 1972 and 1973, respectively. Mr. Meadows did not report any part of the reimbursed expenses as income for either 1972 or 1973. There is no evidence in the record substantiating the amounts or nature of the claimed expenditures. In his notices of deficiency, respondent disallowed the deductions claimed by the Company for those reimbursed travel expenses and treated the reimbursed amounts as constructive dividends to Mr. Meadows. Respondent also increased Mr. Meadows' 1972 income by $107,000, the value of the bank stock transferred to him that year, and increased the Company's income by $22,650, the gain on the transfer of that appreciated bank stock in redemption of the Company's stock. OPINION The primary issue in this case is the proper tax treatment of the distribution of the bank stock in redemption of 550 shares of Mr. Meadows' stock in his wholly-owned corporation, the Company. [9] Both the *310 corporate and the individual petitioners contend the distribution of the bank stock was pursuant to a plan of partial liquidation and is therefore treated by section 331(a)(2) [10] as received in exchange for such stock and taxable at capital gains rates, rather than as a dividend taxable as ordinary income. Respondent asserts that the distribution was not pursuant to a partial liquidation, but was instead a redemption treated by section 302(d) [11] as a distribution of property subject to the provisions of section 301. Furthermore, respondent asserts that the Company was required to recognize gain on the distribution pursuant to section 311(d)(1). [12] For the reasons stated below, we agree with respondent. *311 During the years in issue, section 346 [13] defined a partial liquidation and provided, in pertinent part, that: (a) In General.--For purposes of this subchapter, a distribution shall be treated as in partial liquidation of a corporation if-- (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b). * * * (b) Termination of a Business.--A distribution shall be treated as a distribution described in subsection (a)(2) if the requirements of paragraphs (1) and (2) of this subsection are met. (1) The distribution is attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution, which trade or business was not acquired *312 by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part. (2) Immediately after the distribution the liquidating corporation is actively engaged in the conduct of a trade or business, which trade or business was actively conducted throughout the 5-year period ending on the date of the distribution and was not acquired by the corporation within such period in a transaction in which gain or loss was recognized in whole or in part. Whether or not a distribution meets the requirements of paragraphs (1) and (2) of this subsection shall be determined without regard to whether or not the distribution is pro rata with respect to all of the shareholders of the corporation. If a distribution is in partial liquidation of the distributing corporation under the above version of section 346, then those provisions of section 346 take precedence over those of section 302 and the limitations of section 302 are not applicable. Sec. 346 (c); see also sec. 1.346-2, Income Tax Regs.
*313 There is no question that the distribution in this case was not part of a complete redemption of the Company's outstanding stock, and petitioners could not and do not rely on section 346(a)(1). Petitioners have repeatedly stressed that their argument that the distribution was pursuant to a partial liquidation is based solely on satisfying the requirements of section 346(b)'s "safe harbor," and not on satisfying the more difficult provisions of section 346(a)(2) independently. [14] Thus, the instant transaction must qualify as a partial liquidation under section 346(b) or not at all. Applying section 346(b) to the facts in this case, we think it is clear that the requirements of that section have not been met. *314 Section 346(b) contains numerous requirements that must be strictly complied with to obtain partial liquidation treatment. We need address only a few of the parties' various arguments to resolve the present dispute. One of the major requirements of section 346(b) is that the distribution in question be ". . . attributable to the corporation's ceasing to conduct, or consists of the assets of, a trade or business which has been actively conducted throughout the 5-year period immediately before the distribution . . . ." Sec. 346(b)(1). We think the distribution herein failed to satisfy this requirement. The first hurdle petitioners must clear is demonstrating that the Company's cross-country pipeline construction activities constituted a trade or business separate from its other pipeline construction activities, which were admittedly carried on subsequent to the distribution petitioners contend to be a partial liquidation. [15] Section 346(b) itself provides no guidance in determining whether a group of activities may be said to form a separate trade or business. However, section 1.346-1(c), Income Tax Regs., refers us to section 1.355-1(c), Income Tax Regs., which provides in *315 part that: * * * a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. * * * The regulations then set out 16 examples which are intended to illustrate the application of this definition. See sec. 1.355-1(d), Income Tax Regs. We have found few cases involving the separate trade or business requirement of section 346(b)(1). Guided by the somewhat nebulous definition in the regulations and the examples, the courts have distilled two major factors for a separate trade or business: (1) that the separate business must produce a substantial part of the combined corporate income, and (2) that there must be some form of separation of control and supervision for the separate business. Mains v. United States,508 F. 2d 1251, 1257-1258 (6th Cir. 1975); Blaschka v. United States,184 Ct. Cl. 264, 393 F. 2d 983, 989-992 (1968). *316 As these cases show, merely selling some unwanted or unneeded assets does not constitute a partical liquidation of the corporation. Here, petitioners have not presented sufficient evidence as to the operations of the Company to permit us to determine whether or not the cross-country pipelining activities satisfy these basic requirements for a separate trade or business. See footnote 15. *317 On the evidence of record, we are not persuaded that the Company's cross-country pipeline activities may properly be regarded as a separate trade or business from its other pipeline activities. Petitioners' attempt to segregate the cross-country pipeline activities from the remaining pipeline activities on the basis of such factors as the diameter of the pipe used, average contract price, need for some special equipment (the sidebooms), and size of the work force used on cross-country jobs is unavailing. On the facts presented, we cannot find that the operations of the Company were anything other than an integrated operation involving various kinds of heavy and highway construction work, including pipeline construction. Looking just at the pipeline work, we think it is more reasonable to view all of the Company's pipeline related activities as constituting only one integrated business. While cross-country pipelining work declined in the United States, petitioner continued to perform station pipelining work after 1972. However, even assuming the Company's cross-country pipeline activities could properly be viewed as a trade or business separate from its remaining pipeline activities, *318 the transaction in question herein would still not give rise to a partial liquidation within the meaning of section 346(b) for two additional, but related reasons. Section 1.346-1(b), Income Tax Regs., further explicates the requirements of section 346(b), providing, in part, that: A distribution shall be treated as having been made in partial liquidation pursuant to section 346(b) if it consists of the proceeds of the sale of the assets of a trade or business which has been actively conducted for the five-year period and has been terminated, or if it is a distribution in kind of the assets of such a business, or if it is a distribution in kind of some of the assets of such a business and of the proceeds of the sale of the remainder of the assets of such a business. * * * We have previously construed this language to require that all of the assets of the terminated trade or business must be distributed for an in-kind distribution to constitute a distribution in partial liquidation. Baan v. Commissioner,51 T.C. 1032, 1047 (1969), affd. sub nom. Gordon v. Commissioner,424 F. 2d 378 (2d Cir. 1970), affd. per curiam sub nom. Baan v. Commissioner,450 F. 2d 198 (9th Cir. 1971). *319 Logic any symmetry, as well as the plain language of the above cited regulation and the legislative history of section 346(b), [16] require the conclusion that if all of the assets of the terminated trade or business must be distributed in kind, then all of such assets must likewise be sold before a distribution of the proceeds thereof can be considered in partial liquidation. Here, the Company sold only the seven sidebooms which had been used for cross-country pipelining work. Since the Company, rather than Pipeline, had bought those sidebooms in 1967, 1968, and 1969, before Pipeline's merger with the Company in 1970, we have some difficulty linking those sidebooms solely to Pipeline's cross-country pipelining work. The sidebooms may well have been part of the Company's separate equipment rental business, which was never terminated. [17] In any event, any contention that these seven sidebooms represented all of the assets used in the Company's cross-country pipeline activities would be incredulous. The record clearly reveals that the Company also owned numerous pieces of general construction equipment such as backhoes, excavating equipment, trucks, winches, and various *320 hand tools. That equipment was used in the Company's cross-country pipeline activities as well as in its other construction activities, and none of these assets were sold. Such assets were readily usable in the Company's other construction activities and were retained and used therein. We do not think that the sale of assets which occurred in this case is of the type contemplated by section 346(b). *321 Furthermore, no part of the proceeds from the sale of the sidebooms was distributed. Instead, only the bank stock which had previously been transferred to the Company by Mr. Meadows was distributed. See footnote 9. We have previously held that section 346(b) requires that all of the proceeds of sale must be distributed. Baan v. Commissioner,supra,51 T.C. at 1047. In Baan,supra, at 1047, we said that: This interpretation serves the purpose of the section: if all the proceeds of the transfer of an active business are not distributed to the shareholders, the shareholders would still have an interest in the transferred business inherent in their stock in the transferor, and the rationale for giving a distribution capital gains treatment wuld not be present. In affirming our conclusion on this point, the Second Circuit said: This holding draws support not only from linguistic inference but also from policy. Where a corporation ceases to conduct a discrete portion of its business and distributes the entire assets of this separate portion or the proceeds thereof to the shareholders, Congress has provided that the distribution be *322 treated not as a return of profits but as a return to the shareholders of part of the capital which they had committed to the original venture. If all the actual capital assets of the business or all the proceeds thereof received by the business from a disposition of those assets are being distributed this treatment is eminently logical one. However, between this situation and the hypothetical case where the corporation distributes only a small portion of the assets or the proceeds of their sale, Section 346 draws no line apparent to this court. It seems reasonably clear, moreover, that the phypothetical case just mentioned is not one which deserves to be called a partial liquidation. Indeed, it constitutes nothing more than a reinvestment in another line of business of most of the capital that was used in the terminated business, with the result that there occurs relatively little contraction in the size of the activities of the corporation as a whole. Because the intellectual concept of a partial liquidation is itself a tenuous one and difficult to separate, except by intuition, from the concept of a distribution of profits, we feel compelled to grasp the only certain *323 standard of differentiation which we can see and to require that all the assets of a liquidated business, or all the proceeds thereof, be distributed before the transaction qualifies under Section 346(b). * * * [Emphasis added.] Gordon v. Commissioner,supra,424 F. 2d at 386-387. Clearly the requirement that all of the proceeds be distributed has not been met, since no proceeds of the sale of assets were distributed. Petitioners counter by asserting that respondent's rulings indicate it is sufficient if only the "net proceeds" from the sale are distributed. See Rev. Rul. 60-232, 1960-2 C.B. 115; Rev. Rul. 75-3, 1975-1 C.B. 108; and Rev. Rul. 76-289, 1976-2 C.B. 100. Petitioners then assert that they have met this standard, contending that since the full amount of the sales proceeds was used to extinguish outstanding debts of the Company, no net proceeds remained to be distributed. Petitioners' contention is inapposite. Initially, the rulings upon which they rely are more properly interpreted as defining only the maximum amount (net proceeds of sale plus allocable portion of working capital) which may *324 be distributed under section 346(b) rather than defining the minimum amount required to be distributed. This is clearly indicated by the language in these rulings allowing a distribution of that portion of the working capital reasonably attributable to the terminated business in addition to the net proceeds from the sale of such business assets. Further, even assuming petitioners' contention is correct that only the net proceeds from the sale must be distributed, we do not think the term "net proceeds" can be interpreted so broadly as to cover the transaction herein. Besides the fact that only the bank stock (arguably the allocable portion of working capital) was distributed here, no portion of the proceeds from the sale of assets was distributed. The record establishes that some of the debts which were extinguished with the sales proceeds were collateralized not only by the sidebooms which were sold, but also by various other pieces of equipment used in the Company's other construction activities. Indeed, the record fails to indicate that any such debts were collateralized solely by the sidebooms. To define the term "net proceeds" broadly enough to countenance such a transaction *325 would violate what this Court and the Second Circuit have identified as the purpose underlying the requirement that all of the proceeds be distributed: to prevent a reinvestment of the capital used in the terminated business in another line of the corporation's remaining business, thereby retaining the shareholder's interest in the transferred business which is inherent in his stock in the transferor. See Baan v. Commissioner,supra,51 T.C. at 1047; Gordon v. Commissioner,supra,424 F. 2d at 386. Thus, for the above stated reasons, we think it is clear that the transaction herein did not constitute a partial liquidation within the meaning of section 346(b). [18] Therefore, the redemption of Mr. Meadows' stock is treated as a distribution of property subject to the provisions of section 301, and therefore a dividend to the extent of the Company's current and accumulated earnings and profits. Secs. 302(d) and 316. There were ample earnings and profits so the entire $107,000 is a dividend taxable as ordinary income, as respondent determined. *326 This brings us to the related issue of whether the Company was required to recognize gain on the distribution. Petitioners presented no evidence on this point, nor did they raise any arguments in respect thereto at trial or on brief. Thus, this issue can be disposed of in respondent's favor on the separate grounds of either a concession by petitioners or a failure to carry their burden of proof or to adduce any evidence. Rules 142(a) and 149(b), Tax Court Rules of Practice and Procedure. In any event, disposition of this issue in respondent's favor is also mandated by the clear terms of section 311(d)(1). Therefore, the Company must recognize a gain on the distribution equal to the excess of the fair market value of the distributed property over its adjusted basis to the Company, the same as if such property had been sold on the date of the distribution. That amounts to a gain of $22,650 in this case. The remaining issues concern whether the Company may deduct its reimbursement of Mr. Meadows' foreign travel expenses as an ordinary and necessary business expense under section 162, and also whether such reimbursement constitutes a constructive dividend to Mr. Meadows. [19] *327 For the reasons stated hereinafter, we agree with respondent that such amount is not deductible by the Company and is a constructive dividend to Mr. Meadows. Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The question is essentially factual. Commissioner v. Heininger,320 U.S. 467, 475 (1943); Walliser v. Commissioner,72 T.C. 433, 437 (1979); Henry v. Commissioner,36 T.C. 879, 883 (1961).The Company must show that the expenses claimed were incurred primarily for business rather than personal or social reasons and that there is a proximate relation between the costs of *328 the trip and the Company's business. Henry v. Commissioner,supra,36 T.C. at 884; Larrabee v. Commissioner,33 T.C. 838, 841 (1960). These same principles apply to corporate taxpayers as well as individual taxpayers. International Trading Co. v. Commissioner,275 F. 2d 578 (7th Cir, 1960), affg. a Memorandum Opinion of this Court; International Artists, Ltd. v. Commissioner,55 T.C. 94, 104-105 (1970). The taxpayer has the burden of proof, Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Here petitioners have not carried their burden. The evidence presented at trial consisted in large part of the virtually uncorroborated, self-serving testimony of Mr. Meadows, the Company's sole shareholder. Mr. Meadown testified that this "around the world" trip in 1972 and 1973 was for the purpose of seeking out cross-country pipelining work for the Company, the very type of business that petitioners asserted had been terminated by the Company in early 1972. The scant documentary evidence presented, part of which was entirely in Spanish with no traslation made available, is simply insufficient to *329 persuade us that the primary reason underlying such trip was business related, rather than personal. No evidence was presented as to how much time was spent in performing business-related activities or in obtaining such documents, which for aught that appears in the record could have been miniscule. Furthermore, the only evidence presented to explain why the trip took the form of an around the world trip with his wife and child, as opposed to a direct flight, was Mr. Meadows' undocumented testimony that the method chosen was the less expensive one. On the record herein, we cannot say the the Company has carried its burden of showing that the travel expenses are deductible under section 162. Since the trip expenses are not deductible under section 162, we need not address the issue of whether the requirements of section 274 have been met, but it is clear they have not. Since payments of the travel expenses were not properly deductible by the Company under section 162, and no evidence was presented at trial to show that Mr. Meadows derived no benefit from such payments, [20] the individual petitioners have failed to carry their burden of proving that such amounts did not represent *330 constructive dividends, as determined by respondent. Welch v. Helvering,supra.,Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, respondent is sustained on this issue. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. The record indicates that a total of $744,000.80 was borrowed by the Company during 1969. Other large amounts were also borrowed in subsequent years.↩
3. Respondent does not dispute that these mergers were tax-free.↩
4. Although the shares were not transferred on the books of the Bank of Gassaway until July 7, 1971, such certificates were signed and dated by Mr. Meadows as of December 10, 1970. However, since the actual date of the transfer to the Company does not affect our decision herein, we will treat such transfer as having occurred on December 10, 1970.↩
5. Mr. Meadows suggested that this method was cheaper than air fare for direct flight to their destination, but the record does not disclose what their destination was. ↩
6. Mr. Meadows could not recall whether or not this trip also included stops in Peru, Colombia, and Jamaica. Mr. Meadows was sure he had visited those countries, but not if he had done so on the specific trip in question herein.↩
7. The Certificate is dated June 23, 1975, long after the taxable years in question herein. Mr. Meadows suggested that the discrepancy was due to delay on the part of the Australian officials. However, we note that Mr. Meadows also stated that there was a delay in commencement of the pipelining business that was expected to get underway in Australia. ↩
8. At trial, two documents purporting to give the Company the right to transact business in Venezuela were received into evidence, without objection.However, such documents are entirely in Spanish, and no translation of their contents was offered, although the Court commented on the need therefor.↩
9. Mr. Meadows testified that he always viewed the bank stock as his own ["mine"] and intended at the time he transferred the bank stock to the Company that the bank stock would be returned to him when it was no longer required to satisfy the bonding needs of the Company. Mr. Meadows may have subjectively viewed the transaction as a loan of his bank stock to his corporation which would not result in any taxable event upon return of the bank stock. That view would be consistent with the fact that he reported no income (neither capital gain nor ordinary income) in connection with the distribution of the bank stock in 1972. Unfortunately, the transaction was not structured that way (perhaps due to the demands of the bonding company), and the Court must deal with the transaction as it was structured. In any event, both parties agree that the Company owned the bank stock once it was contributed to its capital in exchange for additional shares of Company stock and that the later distribution of the bank stock back to Mr. Meadows was a distribution in redemption of 550 shares of stock in the Company. ↩
10. During the years in issue, section 331(a)(2) provided that: Amounts distributed in partial liquidation of a corporation (as defined in section 346) shall be treated as in part or full payment in exchange for the stock. Section 331(a) was subsequently amended by section 222(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248 96 Stat. 324, 478, which deleted the provisions concerning partial liquidations, applicable generally to distributions after August 31, 1982. See footnote 13, infra.↩
11. Section 302(d) provides that: * * * Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies. ↩
12. Section 311(d)(1) provides, in part that: (d) Appreciated Property Used to Redeem Stock.-- (1) In General.--If-- (A) a corporation distributes property (other than an obligation of such corporation) to a shareholder in a redemption (to which subpart A applies) of part or all of his stock in such corporation, and (B) the fair market value of such) property exceeds its adjusted basis (in the hands of the distributing corporation), then a gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of the distribution. * * * Section 311(d)(2) sets out several exceptions to this general rule, none of which are applicable herein.↩
13. Section 346 was amended by section 222(d) of TEFRA, supra, at 479, and the special provisions relating to partial liquidations, as modified to cover only noncorporate shareholders, are now found in section 302(e), added to the Code by section 222(c)(2) of TEFRA, supra,↩ at 479, applicable generally to distributions after August 31, 1982.
14. Section 346(b), by its very terms, merely describes one type of distribution that is automatically treated as "not essentially equivalent to a dividend" within the meaning of section 346(a)(2), thus enabling the taxpayer to assure partical liquidation treatment, provided the other requirements of section 346(a)(2) are met. Baan v. Commissioner,51 T.C. 1032, 1044-1045 (1969), affd. sub nom. Gordon v. Commissioner,424 F. 2d 378 (2d Cir. 1970), affd. per curiam sub nom. Baan v. Commissioner,450 F. 2d 198↩ (9th Cir. 1971). However, failure to satisfy the requirements of section 346(b) does not preclude a taxpayer from attempting to rely on the separate, but more difficult, requirements of section 346(a)(2). Petitioners have mode no attempt to bring themselves within the more general provisions of section 346(a)(2).
15. We address this separate trade or business argument in petitioners' own terms of cross-country pipelining construction work versus the Company's other (station) pipelining construction work. However, we are not persuaded that those categories are really two different types of pipelining work, let alone separate trades or businesses. The record shows that Mr. Meadows started in the pipeline and road construction business about 1946 and has been engaged in that business since that time. The Company, from its incorporation in 1954 and before acquisition of Pipeline, was engaged in heavy and highway construction, including some pipeline construction. Pipeline was incorporated in 1956 and Mr. Meadows because its sole shareholder in the mid-1960's. Pipeline's business included maintenance and construction of pipelines, with emphasis on cross-country gas pipelines. However, the record does not indicate now the Company's own mipeline work and/or Pipeline's cross-country pipeline work were carried out either before or after Pipeline's merger with the Company in 1970. There is no evidence to show that cross-country pipelining produced a substantial part of the Company's combined corporate income. There is no evidence of any separation of supervision and control of the purportedly separate cross-country pipelining business. In fact, the record is singularly devoid of any evidence as to the actual operation of the Company's business either before or after the purported partial liquidation. While petitioners placed much emphasis on the need for sidebooms in the cross-country pipelining work and on the later sale of seven sidebooms, Pipeline itself did not own any sidebooms but rented them before its merger with the Company in 1970. We think it significant that the Company purchased sidebooms in 1967, 1968, and 1969 before the merger of the corporations, and sold sidebooms both before and after the merger. Suffice it to say, the record does not indicate that petitioners at any time treated the two types of pipelining work as separate and distinct businesses, either vis-a-vis each other or vis-a-vis the Company's other construction activities.↩
16. The Senate Report, speaking of section 346(b), states: Under this rule, if a corporation is engaged in two or more active businesses which has [sic] been carried on for at least 5 years, it may distribute the assets of either one of the businesses in kind, or the proceeds of their↩ sale. [Emphasis added.] S. Rept. No. 1622, 83d Cong., 2d Sess., 49 (1954). 17. When work became available such as the railroad car work, the Company bought another sideboom in 1972 and rented it to the railroad company. Had cross-country pipelining work again become available, the Company no doubt could have purchased more sidebooms to do the work or could have rented them just as Pipeline had done before it merged with the Company. Thus, we cannot accord to the sale of the sidebooms the significance that petitioners attach to that fact. The sale of the sidebooms can be viewed as a sale of equipment that is no longer needed, rather than as a termination of a separate trade or business. The Company bought and sold sidebooms before Pipeline ever merged with it.↩
18. We note that both parties spent a great deal of time briefing the issue of whether the distribution was pursuant to a "plan" of partial liquidation, section 346(a)(2), since no Form 966 or other written evidence of such a plan was extant herein. Due to our resolution of other issues herein, we need not reach this issue. See, however, Fowler Hosiery Co. v. Commissioner,36 T.C. 201 (1961), affd. 301 F. 2d 394↩ (7th Cir. 1962). Here, there are no facts indicating the existence of any plan.
19. Petitioners have conceded that the portion of such expenses attributable to Mrs. Meadows and the child is both nondeductible by the Company and gives rise to a constructive dividend to Mr. Meadows. However, there is no basis in the record for making any allocation. The Court does not accept Mr. Meadows' self-serving statement that 60 percent of the expenses related to his activities for the Company and only 40 percent related to his wife and child.↩
20. Cf. Foster v. Commissioner,80 T.C. 34 (1983); Ashby v. Commissioner,50 T.C. 409, 417-418↩ (1968). As to the travel expenses for Mrs. Meadows and their child, Mr. Meadows clearly derived a personal benefit and has so conceded. As to his own travel expenses, Mr. Meadows failed to show that he received no benefit, and we think it is clear that he received the benefits of a vacation trip.